JOSHUA A. RIDLESS (SBN No. 195413)
PAUL A. MOORE III (SBN No. 241157)
LAW OFFICES OF JOSHUA A. RIDLESS
244 California Street, Suite 300
San Francisco, CA 94111
Telephone: (415) 614-2600
Facsimile: (415) 480-1398

*Attorneys for Plaintiffs Joanne Elizabeth*
*Cleveland, Cynthia Daniels, Laura Fujisawa,*
*Caroline Howe and Tracey Moore*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

**EDL**

| | |
|---|---|
| JOANNE ELIZABETH CLEVELAND, CYNTHIA DANIELS, LAURA FUJISAWA, CAROLINE HOWE and TRACEY MOORE,<br><br>Plaintiffs,<br><br>v.<br><br>COMPASS VISION, INC.,NATIONAL MEDICAL SERVICES, INC. d/b/a NMS LABS, and DOES ONE THROUGH TWENTY,<br><br>Defendants. | Case No.:<br><br>**CV 07     5642**<br><br>**COMPLAINT FOR DAMAGES**<br><br>DEMAND FOR JURY TRIAL |

Plaintiffs, by way of Complaint against Defendants, upon information and belief, allege as follows:

## **PARTIES**

1.    Plaintiff, **JOANNE ELIZABETH CLEVELAND** ("**MS. CLEVELAND**"), is a citizen and resident of California, residing at 1745 Rodgers Road, Hanford, CA 93230.

- 1 -

2.    Plaintiff, **CYNTHIA DANIELS** ("**MS. DANIELS**"), is a citizen and resident of California, residing at 2033 Meridian Way, Rocklin, CA 95765 .

3.    Plaintiff, **LAURA FUJISAWA** ("**MS. FUJISAWA**"), is a citizen and resident of California, residing at 991 Kings Drive Circle, Reedley, CA 93654.

4.    Plaintiff, **CAROLINE HOWE** ("**MS. HOWE**"), is a citizen and resident of California, residing at 4364 Steele Street, Oakland, CA 94619.

5.    Plaintiff, **TRACEY MOORE** ("**MS. MOORE**"), is a citizen and resident of California, residing at 2535 Hogan Drive, Turlock, CA 953820.

6.    Defendant, **COMPASS VISION, INC. ("COMPASS")** is a corporation with its principal place of business in the State of Oregon at SW Town Center Loop E, Wilsonville, Oregon, 97070. It has transacted business in California, including the business that gives rise to the causes of action at issue.

7.    Defendant Compass is a Third Party Administrator ("TPA"), specializing, inter alia, in the design, implementation, and management of drug and alcohol testing programs, including the collection of urine samples.

8.    On information and belief defendant Compass contracted with the California State Board of Nursing and the California State Board of Pharmacy, through Maximus, Administrator of the California nurses and pharmacists recovery programs, to be the TPA administering drug and alcohol testing of nurses and pharmacists, including the testing of the plaintiffs in the Northern District of California.

9.    Defendant **NATIONAL MEDICAL SERVICES, INC. d/b/a NMS LABS ("NMS")** is a corporation with its principal place of business in the State Pennsylvania at 3701 Welsh Road, Willow Grove, Pennsylvania, 19090. NMS also has lab testing facilities and offices throughout the United States.  It has transacted business in California, including the business that gives rise to the causes of action at issue.

- 2 -

10.    On information and belief defendant NMS through defendant Compass contracted with the California State Boards of Nursing and Pharmacy, through Maximus, to do EtG (ethyl glucuronide) testing of health care providers, including the plaintiffs, who are nurses and pharmacists.

## JURISDICTION AND VENUE

11.    Jurisdiction in this action is based upon diversity of citizenship, 28 U.S.C. Section 1332 (a), and that damages for each plaintiff exceed, exclusive of interest and costs, the sum of Seventy-Five Thousand ($75,000.00) Dollars.

12.    Venue lies in the Southern District of California as the plaintiffs reside therein and the defendants are transacting substantial business in this District.

## COMMON OPERATIVE FACTS

13.    As a TPA, Compass contracts its services to various state and municipal agencies, as well as state licensure boards. At all relevant times pertinent to this action Compass provided TPA services to the California State Boards of Nursing and Pharmacy. The Boards administer, inter alia, the licensing privileges of registered nurses and pharmacists.

14.    At all times relevant hereto, NMS and Compass provided to the Boards the results and interpretation of EtG alcohol testing upon registered nurses and pharmacists.

15.    Because of the sensitive nature of their positions with respect to patient care, California registered nurses and pharmacists, who have an admitted history of addiction, are allowed to enter into Diversion Program Recovery Contracts with Maximus, by which they agree to submit to random urine analysis to document a drug-free condition in a known "zero-tolerance" environment.

16.    Random drug screening is not a requirement for registered nurses and pharmacists in California, unless they have an admitted history of addiction, and have

- 3 -

1 | voluntarily entered into an agreement as part of continued employment or are placed on
2 | probation.

3 | 17. "EtG" stands for ethyl glucuronide, a metabolite of alcohol, and was reported by
4 | Gregory Skipper, M.D. ("Dr. Skipper") and Friedrich Wurst, M.D., in November 2002 at an
5 | international meeting of the American Medical Society, to provide proof of alcohol
6 | consumption as much as 5 days after drinking an alcoholic beverage, well after the alcohol itself
7 | had been eliminated from the body.

8 | 18. In 2003, because of these and other reportedly remarkable results (e.g., positive
9 | findings, confirmed by admissions by the tested individuals, after traditional urine tests had
10 | registered negative), EtG testing began in the United States.

11 | 19. On information and belief, Compass and NMS became leading proponents of
12 | EtG testing, and 2003 started published statements and claims promoting the absolute reliability
13 | and validity of EtG in detecting alcohol abuse in promotional materials, on websites, in
14 | published articles and in statements by their sales personnel, including promoting EtG testing as
15 | the "gold standard."

16 | 20. On information and belief, Compass and NMS initially established a reporting
17 | limit or cut-off of 250ng/ml at or over which EtG test results would be reported as "positive" for
18 | drinking alcohol. This was later changed by the defendants to 500ng/ml.

19 | 21. It is believed and therefore averred that on laboratory reports indicating the
20 | results of EtG testing, issued at relevant times to this action, National Medical Services included
21 | the statement that "any value above 250 ng/ml indicates ethanol consumption."

22 | 22. It is believed and therefore averred that Compass Vision claims that any EtG test
23 | result of 500 ng/ml and above conclusively proved intentional consumption of an alcoholic
24 | beverage, and that Compass sponsored a paper with that claim by Dr. Martha Brown, its
25 | employee and Medical Review Officer.

- 4 -

Complaint for Damages
*Cleveland, et al., v. Compass Vision, et al.*

23. It is believed and therefore averred that based on such unequivocally conclusive statements and claims by the defendants, California instituted EtG testing and the State Boards of Nursing and Pharmacy, through Maximus, became a signatory to a service contract with Compass as its TPA and NMS as a testing lab facility for EtG testing programs.

24. It has come to light about EtG testing that:

    a. Many ordinary products, including the omnipresent Purell sanitizer and other hand sanitizers used in hospitals throughout the country, contain ethanol;

    b. The use or exposure to such products – known collectively as "incidental" or "involuntary" exposure – could result in positive test results, since they all would metabolize as ethyl glucuronide;

    c. The cut-offs of 250ng/ml and 500ng/ml are arbitrary standards since incidental exposure to ethanol-containing products could show up at levels well above these levels;

    d. The published state of scientific knowledge, going as far back as March 2004, included the information set forth in subparagraphs a-c above.

25. This has not deterred the \$4 billion-a-year industry, and the defendants. It is believed and therefore averred, solely due to a motive of profits, that the defendants: (a) continue to promote the EtG test as valid, (b) have not established a non arbitrary cut-off; and/or, (c) have not repudiated the test to the licensing boards and agencies.

26. On August 12, 2006, The Wall Street Journal published a front-page article, titled "A Test for Alcohol – And Its Flaws."

- 5 -

27.    Quoting Dr. Skipper, among others, the article includes the following statements:

"Little advertised, though, is that EtG can detect alcohol even in people who didn't drink. Any trace of alcohol may register, even that ingested or inhaled through food, medicine, personal-care products or hand sanitizer."

"The test 'can't distinguish between beer and Purell' hand sanitizer, says H. Westley Clark, director of the Federal Substance Abuse and Mental Health Services Administration. . . 'When you're looking at loss of job, loss of child, loss of privileges, you want to make sure the test is right", he says..."

"Use of this screen has gotten ahead of the science,' says Gregory Skipper..."

28.    In a February 2007 article in "New Scientist" magazine, Dr. Skipper is quoted as saying:

"...there is not yet an agreed threshold concentration that can be used to separate people who have been drinking from those exposed to alcohol from other sources. Below 1000 nanograms of EtG per millilitre of urine is probably 'innocent', and above 5000 booze is almost certainly to blame. In between there is a "question zone..."

29.    Upon information and belief, representatives of Compass and NMS continue to deny and challenge these warnings, insisting that the tests are accurate and reliable measurements based on alleged scientific research.

30.    On September 28, 2006, Substance Abuse and Mental Health Services Administration ("SAMHSA"), a federal agency that is part of the U.S. Department of Health and Human Resources, issued an Advisory, which on the first page contained a "grey box" warning, as follows:

"Currently, the use of an EtG test in determining abstinence lacks sufficient proven specificity for use as primary or sole evidence that an individual prohibited from drinking, in a criminal justice or a regulatory compliance context, has truly been

- 6 -

drinking. Legal or disciplinary action based solely on a positive EtG, or other test discussed in this *Advisory* is inappropriate and scientifically unsupportable at this time. These tests should currently be considered as potential valuable clinical tools, but their use in forensic settings is premature."

31.     Defendants have refused to follow the SAMHSA Advisory and continue to utilize an arbitrary cut-off, and support their "positive" findings to the Board (and other licensing and law enforcement agencies) in the face of disciplinary action against the tested individuals.

32.     Defendants, by promoting, advertising, marketing, selling, and/or contracting with the licensing board, and/or designing, implementing, and managing the drug and alcohol testing program, and/or collecting the urine samples and/or utilizing, reporting and interpreting the EtG test to allegedly establish that the plaintiffs consumed an alcoholic beverage, had a duty to use a reasonable degree of care to avoid erroneous test results.

33.     Plaintiffs, as nurses and pharmacists, were intended test subjects and defendants knew that their licenses and occupations would be in jeopardy if they tested positive.

34.     Plaintiffs by entering into voluntary screening programs, both for rehabilitative and occupational reasons, relied on the validity of the tests to which they subjected themselves – with the goal that they could provide laboratory evidence of their abstinence.

35.     Because of the obvious, foreseeable, serious and devastating consequences of reporting that the results were positive (within cut-offs established by the defendants), defendants had to use a reasonable degree of care to avoid erroneous test results to the foreseeable test subjects, including the plaintiffs.

36.     Instead, upon information and belief, defendants acted negligently and/or recklessly by:

- 7 -

a.    Marketing their tests without conducting adequate scientific or medical studies;

b.    Establishing cut-offs over which test results would be reported as "positive" that were arbitrary and scientifically unreliable and invalid;

c.    Promoting the EtG test with unsupported and false statements that a positive EtG test would unequivocally establish that the subject individual had consumed alcoholic beverages;

d.    Publishing warnings that the failure to conduct such a test would be negligence on the part of an employer or licensing board;

e.    Falsely asserting that the EtG test was the "gold standard" in ferreting out former alcoholics or drug users who were resuming or beginning to engage in prohibited alcoholic consumption in occupations requiring a "zero tolerance";

f.    Falsely asserting that EtG is not detectable in the urine unless an alcoholic beverage has been consumed, thereby concealing that incidental or involuntary exposure or consumption of products containing alcohol could result in positive findings;

g.    Failing and refusing to re-evaluate and re-set cut-off limits at levels that were scientifically sound and reliable markers for detecting the prohibited activity of alcoholic beverage consumption, and excluding other causes for their results;

h.    Failing to heed the warnings or cautionary advisories issued by Dr. Skipper, SAMHSA, and others – that the cut-off levels were unreliable and arbitrary, and that incidental use could trigger

- 8 -

positive results at levels at or above the cut-offs – and, instead, denying publicly and maintaining the warnings were insufficient to discredit the EtG test and its cut-off limits;

i.      Failing to protect the plaintiffs from foreseeable substantial harm in the form of disciplinary and punitive measures, when their EtG test systems were employed and relied upon for their accuracy and reliability;

j.      Utilizing, reporting and interpreting the EtG results of plaintiffs to assert that plaintiffs were violating their recovery by intentionally drinking alcoholic beverages.

## COUNT I

## JOANNE ELIZABETH CLEVELAND V COMPASS VISION & NMS

37.    Plaintiff Joanne Elizabeth Cleveland incorporates by reference paragraphs 1-36 as if set forth fully hereunder.

38.    In or about March 2004, after admitting to pain medication dependency, Joanne Elizabeth Cleveland signed a Recovery Contract with the California State Board of Nursing submitting herself to a recovery program including, inter alia, future random urine testing.

39.    At all relevant times to this action, including the time in which she participated in the program, while working as a registered nurse, Ms. Cleveland maintained her recovery and sobriety, denied intentionally drinking any alcoholic beverages, denied any relapse and did not drink any alcoholic beverage.

40.    Within a few months of the end of her program, on or about December 29, 2005, Ms. Cleveland submitted to a random urine analysis collected by Compass and performed by

- 9 -

1  NMS. In January 2006 she received notice of a "positive" result of 600 ng/ml on the EtG test in

2  violation of her agreement.

3      41.  ·Plaintiff has had a total of four "positive" EtG tests on urine samples collected

4  by Compass, performed by NMS and reported and interpreted by both defendants, with the last

5  "positive" EtG test of 900 ng/ml on or about July 27, 2006.

6      42.  The so called "positive" EtG testing of Ms. Cleveland and the injuries she

7  suffered are as a direct result of the negligence and/or recklessness of the defendants in

8  promoting, advertising, marketing, selling, and/or contracting with the licensing board, and/or

9  designing, implementing, and managing the EtG alcohol testing program, and/or collecting the

10 urine samples and/or performing and/or interpreting the EtG testing and/or utilizing the EtG test

11 to allegedly establish that the plaintiff consumed an alcoholic beverage, when it lacked

12 sufficient proven specificity for use as primary or sole evidence that an individual prohibited

13 from drinking, in a regulatory compliance context, had truly been drinking.

14     43.  As a result of the "positive" EtG tests, Ms. Cleveland was not allowed to work as

15 a nurse for approximately four weeks and had her program extended. She also has been required

16 to have additional testing, treatment and program attendance. Moreover, she suffered damage to

17 her reputation with consequent anxiety, stress and humiliation.

18     44.  As a further result of the "positive" EtG tests, Ms Cleveland was forced to leave

19 the diversion program when she was unable to afford unneeded mandatory in-patient treatment,

20 which the Board required as a result of her "positive" EtG test.

21     45.  As a further result of the "positive" EtG tests, Ms Cleveland now faces at least

22 three years of probation, with attendant costs, and the future loss of her license to practice

23 nursing.

24     46.  As a direct and proximate result of the defendants' negligence, plaintiff has

25 suffered and/or may suffer great, permanent and irreparable harm. These injuries may include,

- 10 -

1   but are not limited to: the active suspension of her license, probation, risk of the loss of her

2   license, loss of earnings and earning capacity, additional expenses associated with random EtG

3   tests and other evaluations and programs, lawyers fees, other pecuniary losses flowing directly

4   and consequentially from the EtG testing, damage to reputation, humiliation, insomnia,

5   depression, anxiety and severe emotional and psychological distress, all or some of which are

6   continuing in nature.

7       47.    As a direct and proximate result of the defendants' negligence, plaintiff suffered

8   damages as a result of lost earnings and consequent costs for medical evaluations, treatment,

9   program attendance and drug screenings. Her monetary losses to date total approximately

10  $17,000 dollars.

11      48.    The aforesaid negligence and recklessness on the part of the defendants was

12  wanton and outrageous in nature.

13      WHEREFORE, Plaintiff demands judgment against the Defendants for compensatory

14  damages in an amount exceeding the jurisdictional limits for diversity, and punitive damages,

15  plus interest and costs.

16                                      **COUNT II**

17                      **CYNTHIA DANIELS V COMPASS VISION & NMS**

18      49.    Plaintiff Cynthia Daniels incorporates by reference paragraphs 1-36 as if set

19  forth fully hereunder.

20      50.    In or about July 2004, after admitting to pain medication dependency, Cynthia

21  Daniels signed a Recovery Contract with the California State Board of Pharmacy submitting

22  herself to a recovery program including, inter alia, future random urine testing.

23      51.    At all relevant times to this action, including the time in which she participated

24  in the program, while working as a pharmacist, Ms. Daniels maintained her recovery and

25

Complaint for Damages
*Cleveland, et al., v. Compass Vision, et al.*

1    sobriety, denied intentionally drinking any alcoholic beverages, denied any relapse and did not
2    drink any alcoholic beverage.

3    52.    On or about June 30, 2006, after almost two years of full and complete
4    adherence to her program and within weeks of being eligible for transition out of the program,
5    Ms. Daniels submitted to a random urine analysis collected by Compass and performed by
6    NMS. In July she received notice of a "positive" result of 510 ng/ml on the EtG test in violation
7    of her agreement.

8    53.    Plaintiff has had a total of four "positive" EtG tests on urine samples collected
9    by Compass, performed by NMS and reported and interpreted by both defendants, with the last
10   "positive" EtG test in or about August, 2007.

11   54.    The so called "positive" EtG testing of Ms. Daniels and the injuries she suffered
12   are as a direct result of the negligence and/or recklessness of the defendants in promoting,
13   advertising, marketing, selling, and/or contracting with the licensing board, and/or designing,
14   implementing, and managing the EtG alcohol testing program, and/or collecting the urine
15   samples and/or performing and/or interpreting the EtG testing and/or utilizing the EtG test to
16   allegedly establish that the plaintiff consumed an alcoholic beverage, when it lacked sufficient
17   proven specificity for use as primary or sole evidence that an individual prohibited from
18   drinking, in a regulatory compliance context, had truly been drinking.

19   55.    As a result of the "positive" EtG tests, Ms. Daniels was suspended for over six
20   months and not allowed to work as a pharmacist, had difficulty finding employment after the
21   suspension, was required to stay longer in the program and was required to have additional
22   testing. She also suffered damage to her reputation with consequent anxiety, stress and
23   humiliation.

24   56.    As a direct and proximate result of the defendants' negligence, plaintiff has
25   suffered and/or may suffer great, permanent and irreparable harm. These injuries may include,

- 12 -

Complaint for Damages
*Cleveland, et al., v. Compass Vision, et al.*

1  but are not limited to: the active suspension of her license, probation, risk of the loss of her
2  license, loss of earnings and earning capacity, additional expenses associated with random EtG
3  tests and other evaluations and programs, lawyers fees, other pecuniary losses flowing directly
4  and consequentially from the EtG testing, damage to reputation, humiliation, insomnia,
5  depression, anxiety and severe emotional and psychological distress, all or some of which are
6  continuing in nature.

7      57.    As a direct and proximate result of the defendants' negligence, plaintiff suffered
8  damages as a result of lost earnings, penalty and loss of interest from retirement fund, and
9  consequent costs for additional medical evaluations, treatment, program attendance and drug
10  screenings. Her monetary losses to date total approximately $120,000 dollars.

11     58.    The aforesaid negligence and recklessness on the part of the defendants was
12  wanton and outrageous in nature.

13     WHEREFORE, Plaintiff demands judgment against the Defendants for compensatory
14  damages in an amount exceeding the jurisdictional limits for diversity, and punitive damages,
15  plus interest and costs.

16                                **COUNT III**

17                    **LAURA FUJISAWA V COMPASS VISION & NMS**

18     59.    Plaintiff Laura Fujisawa incorporates by reference paragraphs 1-36 as if set forth
19  fully hereunder.

20     60.    In or about January 2005, after admitting to pain medication dependency, Laura
21  Fujisawa signed a Recovery Contract with the California State Board of Pharmacy submitting
22  herself to a recovery program including, inter alia, future random urine testing.

23     61.    At all relevant times to this action, including the time in which she participated
24  in the program, Ms. Fujisawa maintained her recovery and sobriety, denied intentionally
25  drinking any alcoholic beverages, denied any relapse and did not drink any alcoholic beverage.

- 13 -

62. On or about September 26, 2006, after almost two years of full and complete adherence to her program, Ms. Fujisawa submitted to a random urine analysis collected by Compass and performed by NMS. In October, 2006 she received notice of a "positive" result of 1800 ng/ml on the EtG test in violation of her agreement.

63. Plaintiff has had a total of six "positive" EtG tests on urine samples collected by Compass, performed by NMS and reported and interpreted by both defendants, with the last "positive" EtG test of 570 ng/ml in or about March 2007.

64. The so called "positive" EtG testing of Ms. Fujisawa and the injuries she suffered are as a direct result of the negligence and/or recklessness of the defendants in promoting, advertising, marketing, selling, and/or contracting with the licensing board, and/or designing, implementing, and managing the EtG alcohol testing program, and/or collecting the urine samples and/or performing and/or interpreting the EtG testing and/or utilizing the EtG test to allegedly establish that the plaintiff consumed an alcoholic beverage, when it lacked sufficient proven specificity for use as primary or sole evidence that an individual prohibited from drinking, in a regulatory compliance context, had truly been drinking.

65. As a result of the "positive" EtG tests, Ms. Fujisawa has been prevented from working as a pharmacist for over one year and was required to have additional testing and treatment. She was terminated from the program as of about March 2007, and faces revocation proceedings, for which she has had to hire an attorney. She also suffered damage to her reputation with consequent anxiety, stress and humiliation.

66. As a direct and proximate result of the defendants' negligence, plaintiff has suffered and/or may suffer great, permanent and irreparable harm. These injuries may include, but are not limited to: the active suspension of her license, probation, risk of the loss of her license, loss of earnings and earning capacity, additional expenses associated with random EtG tests and other evaluations and programs, lawyers fees, other pecuniary losses flowing directly

- 14 -

1  and consequentially from the EtG testing, damage to reputation, humiliation, insomnia,

2  depression, anxiety and severe emotional and psychological distress, all or some of which are

3  continuing in nature.

4     67.    As a direct and proximate result of the defendants' negligence, plaintiff suffered

5  damages as a result of lost earnings, legal fees, and consequent costs for medical evaluations,

6  treatment, program attendance and drug screenings. Her monetary losses to date total more than

7  $105,000 dollars.

8     68.    The aforesaid negligence and recklessness on the part of the defendants was

9  wanton and outrageous in nature.

10  WHEREFORE, Plaintiff demands judgment against the Defendants for compensatory

11  damages in an amount exceeding the jurisdictional limits for diversity, and punitive damages,

12  plus interest and costs.

13                                   **COUNT IV**

14                 **CAROLINE HOWE V COMPASS VISION & NMS**

15     69.    Plaintiff Caroline Howe incorporates by reference paragraphs 1-36 as if set forth

16  fully hereunder.

17     70.    In or about March 2005, after admitting to prescription pain medication

18  dependency, Caroline Howe signed a Recovery Contract with the California State Board of

19  Nursing submitting herself to a recovery program including, inter alia, future random urine

20  testing.

21     71.    At all relevant times to this action, including the time in which she participated

22  in the program while working as a registered nurse, Ms. Howe maintained her recovery and

23  sobriety, denied intentionally drinking any alcoholic beverages, denied any relapse and did not

24  drink any alcoholic beverage.

25

- 15 -

72.     In or about July, 2006, after over a year of full and complete adherence to her program, Ms. Howe submitted to a random urine analysis collected by Compass and performed by NMS. Later that month she received notice of two low level "positive" results on EtG tests in violation of her agreement. She was not told the actual levels.

73.     Plaintiff has had a total of seven "positive" EtG tests on urine samples collected by Compass, performed by NMS and reported and interpreted by both defendants, with the last "positive" EtG test in or about September 21, 2007.

74.     The so called "positive" EtG testing of Ms. Howe and the injuries she suffered are as a direct result of the negligence and/or recklessness of the defendants in promoting, advertising, marketing, selling, and/or contracting with the licensing board, and/or designing, implementing, and managing the EtG alcohol testing program, and/or collecting the urine samples and/or performing and/or interpreting the EtG testing and/or utilizing the EtG test to allegedly establish that the plaintiff consumed an alcoholic beverage, when it lacked sufficient proven specificity for use as primary or sole evidence that an individual prohibited from drinking, in a regulatory compliance context, had truly been drinking.

75.     As a result of the "positive" EtG tests, Ms. Howe has had her program extended, she was not allowed to work as a nurse for approximately 10 weeks, in January 2007 she was prohibited from taking a nursing position that paid substantially more than what she was then making, and as of August 30, 2007 she had to leave her job with the Red Cross. She has been required to have additional testing, treatment and program attendance. Moreover she has suffered damage to her reputation with consequent anxiety, stress and humiliation.

76.     As a direct and proximate result of the defendants' negligence, plaintiff has suffered and/or may suffer great, permanent and irreparable harm. These injuries may include, but are not limited to: the active suspension of her license, probation, risk of the loss of her license, loss of earnings and earning capacity, additional expenses associated with random EtG

- 16 -

1  tests and other evaluations and programs, lawyers fees, other pecuniary losses flowing directly
2  and consequentially from the EtG testing, damage to reputation, humiliation, insomnia,
3  depression, anxiety and severe emotional and psychological distress, all or some of which are
4  continuing in nature.

5      77.    As a direct and proximate result of the defendants' negligence, plaintiff suffered
6  damages as a result of lost earnings and consequent costs for medical evaluations, treatment,
7  program attendance and drug screenings. Her monetary losses to date total approximately
8  $45,000 dollars.

9      78.    The aforesaid negligence and recklessness on the part of the defendants was
10  wanton and outrageous in nature.

11     WHEREFORE, Plaintiff demands judgment against the Defendants for compensatory
12  damages in an amount exceeding the jurisdictional limits for diversity, and punitive damages,
13  plus interest and costs.

14                                    **COUNT VI**

15                      **TRACEY MOORE V COMPASS VISION & NMS**

16     79.    Plaintiff Tracey Moore incorporates by reference paragraphs 1-36 as if set forth
17  fully hereunder.

18     80.    In or about November 2006, after 10 years of continuous recovery, in order to
19  complete probationary terms from a ten year prior pain medication dependency, Tracey Moore
20  Pharm.D. signed a Recovery Contract with the California State Board of Pharmacy submitting
21  herself to a recovery program including, inter alia, future random urine testing.

22     81.    At all relevant times to this action, including the time in which she participated
23  in the program, while working as a pharmacist, Dr. Moore maintained her recovery and
24  sobriety, denied intentionally drinking any alcoholic beverages, denied any relapse and did not
25  drink any alcoholic beverage.

- 17 -

Complaint for Damages
*Cleveland, et al., v. Compass Vision, et al.*

82. On or about March 10, 2007, Dr. Moore submitted to a random urine analysis collected by Compass, performed by NMS and reported and interpreted by both defendants. Later that month she received notice of a "positive" result of 315 ng/ml on the EtG test in violation of her agreement.

83. The so-called "positive" EtG testing of Dr. Moore and the injuries she suffered are as a direct result of the negligence and/or recklessness of the defendants in promoting, advertising, marketing, selling, and/or contracting with the licensing board, and/or designing, implementing, and managing the EtG alcohol testing program, and/or collecting the urine samples and/or performing and/or interpreting the EtG testing and/or utilizing the EtG test to allegedly establish that the plaintiff consumed an alcoholic beverage, when it lacked sufficient proven specificity for use as primary or sole evidence that an individual prohibited from drinking, in a regulatory compliance context, had truly been drinking.

84. As a result of the "positive" EtG test, Ms. Moore was suspended for one week and not allowed to work as a pharmacist, was ordered to test more often, have additional counseling and suffered damage to her reputation with consequent anxiety, stress and humiliation.

85. As a direct and proximate result of the defendants' negligence, plaintiff has suffered and/or may suffer great, permanent and irreparable harm. These injuries may include, but are not limited to: the active suspension of her license, probation, risk of the loss of her license, loss of earnings and earning capacity, additional expenses associated with random EtG tests and other evaluations and programs, lawyers fees, other pecuniary losses flowing directly and consequentially from the EtG testing, damage to reputation, humiliation, insomnia, depression, anxiety and severe emotional and psychological distress, all or some of which are continuing in nature.

- 18 -

86.    As a direct and proximate result of the defendants' negligence, plaintiff suffered damages as a result of lost earnings and consequent costs for medical evaluations, program attendance and drug screenings. Her monetary losses to date total approximately $4,000.

87.    The aforesaid negligence and recklessness on the part of the defendants was wanton and outrageous in nature.

WHEREFORE, Plaintiff demands judgment against the Defendants for compensatory damages in an amount exceeding the jurisdictional limits for diversity, and punitive damages, plus interest and costs.

DATED:  November 6, 2007                 Respectfully Submitted,

                                         LAW OFFICES OF JOSHUA A. RIDLESS

                                         By:   _____
                                                   Joshua A. Ridless

                                         Joshua A. Ridless
                                         Paul A. Moore III
                                         LAW OFFICES OF JOSHUA A. RIDLESS
                                         244 California Street, Suite 300
                                         San Francisco, CA 94111
                                         Telephone: (415) 614-2600
                                         Facsimile: (415) 480-1398

                                         *Attorneys for Plaintiffs Joanne Elizabeth Cleveland, Cynthia Daniels, Laura Fujisawa, Caroline Howe and Tracey Moore*

- 19 -