Norman Perlberger, Esquire            Attorney Pro Hac Vice for Plaintiffs
POMERANTZ PERLBERGER & LEWIS LLP
21 South 12th Street, 7th Floor
Philadelphia, PA 19107
(215)  569-8866
nperlberger@ppl-law.com

---

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA


| | |
|---|---|
| **JOANNE ELIZABETH CLEVELAND,** | **: CIVIL ACTION NO. CV 07 5642 EDL** |
| **CYNTHIA DANIELS, LAURA FUJISAWA,** | : |
| **CAROLINE HOWE** | : |
| **and TRACEY MOORE** | : |
|            **Plaintiffs** | : |
| | : |
| **vs.** | : |
| | : |
| **COMPASS VISION, INC. and** | : |
| **NATIONAL MEDICAL SERVICES, INC.** | : |
| **D/B/A NMS LABS** | : |
| | : |
| | :      **JURY TRIAL DEMANDED** |
| | : |

---

## AMENDED COMPLAINT

       Plaintiffs, by way of Amended Complaint against Defendants, upon information and belief, allege as follows:

### PARTIES

       1.     Plaintiff, **JOANNE ELIZABETH CLEVELAND** ("**MS**. **CLEVELAND**"), is a citizen and resident of California, residing at 1745 Rodgers Road, Hanford, CA 93230.

       2.     Plaintiff, **CYNTHIA DANIELS** ("**DR**. **DANIELS**"), is a citizen and resident of California, residing at 2033 Meridian Way , Rocklin, CA 95765 .

3.      Plaintiff, **LAURA FUJISAWA** ("**DR**. **FUJISAWA**"), is a citizen and resident of California, residing at 991 Kings Drive Circle, Reedley, CA 93654.

4.      Plaintiff, **CAROLINE HOWE** ("**MS**. **HOWE**"), is a citizen and resident of California, residing at 4364 Steele Street, Oakland, CA 94619.

5.      Plaintiff, **TRACEY MOORE** ("**DR**. **MOORE**"), is a citizen and resident of California, residing at 2365 Celebration Lane, Turlock, CA 95380.

6.      Defendant, **COMPASS VISION, INC. ("COMPASS")** is a corporation with its principal place of business in Oregon at SW Town Center Loop E, Wilsonville, ORE 97070. It has transacted business in California, including the business that gives rise to the causes of action at issue.

7.      Defendant Compass is a third party administrator ("TPA"), specializing, inter alia, in the design, implementation, and management of drug and alcohol testing programs, including the collection of urine samples.

8.      On information and belief defendant Compass contracted with the California State Board of Nursing and the California State Board of Pharmacy, through Maximus, Administrator of the California nurses and pharmacists recovery programs, to be the TPA administering drug and alcohol testing of nurses and pharmacists, including the testing of the plaintiffs in the Northern District of California.

9.      Defendant **NATIONAL MEDICAL SERVICES, INC. DBA NMS LABS ("NMS")** is a corporation with its principal place of business in Pennsylvania at 3701 Welsh Road, Willow Grove, PA 19090. NMS also has lab testing facilities and offices throughout the United States.  It has transacted business in California, including the business that gives rise to the causes of action at issue.

2

10.    On information and belief defendant NMS through defendant Compass contracted with the California State Boards of Nursing and Pharmacy, through Maximus, to do EtG (ethyl glucuronide) testing of health care providers, including the plaintiffs, who are nurses and pharmacists.

## JURISDICTION AND VENUE

11.    Jurisdiction in this action is based upon diversity of citizenship, 28 U.S.C. Section 1332 (a), and that damages for each plaintiff exceed, exclusive of interest and costs, the sum of Seventy-five Thousand ($75,000.00) Dollars.

12.    Venue lies in the Northern District of California as the plaintiffs reside therein and the defendants are transacting substantial business in this District.

## COMMON OPERATIVE FACTS

13.    As a TPA, Compass contracts its services to various state and municipal agencies, as well as state licensure boards. At all relevant times pertinent to this action Compass provided TPA services to the California State Boards of Nursing and Pharmacy. The Boards administer, inter alia, the licensing privileges of registered nurses and pharmacists.

14.    At all times relevant hereto, it is believed and therefore averred that Compass and NMS provided to the Boards the results and interpretation of the results of EtG alcohol testing upon registered nurses and pharmacists as contracted through Compass.

15.    Because of the sensitive nature of their positions with respect to patient care, California registered nurses and pharmacists, who have an admitted history of addiction, are allowed to enter into Diversion Program Recovery Contracts with

Maximus, by which they agree to submit to random urine analysis to document a drug-free condition in a known "zero-tolerance" environment.

16.    Random drug screening is not a requirement for registered nurses and pharmacists in California, unless they have an admitted history of addiction, and have voluntarily entered into an agreement as part of continued employment or are placed on probation.

17.    "EtG" stands for ethyl glucuronide, a metabolite of alcohol, and was reported by Gregory Skipper, M.D. ("Dr. Skipper") and Friedrich Wurst, M.D., in November 2002 at an international meeting of the American Medical Society, to provide proof of alcohol consumption as much as 5 days after drinking an alcoholic beverage, well after the alcohol itself had been eliminated from the body.

18.    In 2003, because of these and other reportedly remarkable results (e.g., positive findings, confirmed by admissions by the tested individuals, after traditional urine tests had registered negative), EtG testing began in the United States.

19.    On information and belief, Compass and NMS became leading proponents of EtG testing, and starting in 2003, published statements and claims promoting the absolute reliability and validity of EtG in detecting alcohol abuse, in promotional materials, on websites, in published articles and in statements by their sales personnel, including promoting EtG testing as the "gold standard."

20.    On information and belief, initially, the defendants, Compass and NMS, determined and established a reporting limit or cutoff of 250ng/ml at or over which EtG test results would be reported as "positive" for drinking alcohol. This was later changed by the defendants to 500ng/ml.

21.    It is believed and therefore averred that on laboratory reports indicating the results of EtG testing, issued at relevant times to this action, National Medical Services included the statement that "any value above 250 ng/ml indicates ethanol consumption."

22.    It is believed and therefore averred that Compass Vision claims that any EtG test result of 500 ng/ml and above conclusively proved intentional consumption of an alcoholic beverage, and that Compass sponsored a paper with that claim by Dr. Martha Brown, its employee and Medical Review Officer.

23.    It is believed and therefore averred that based on such unequivocally conclusive statements and claims by the defendants, California instituted EtG testing and the State Boards of Nursing and Pharmacy, through Maximus, became a signatory to a service contract with Compass as its TPA and NMS as a testing lab facility for EtG testing programs.

24.    It has come to light about EtG testing that:

    a.    Many ordinary products, including the omnipresent Purell sanitizer and other hand sanitizers used in hospitals throughout the country, contain ethanol;

    b.    The use or exposure to such products – known collectively as "incidental" or "involuntary" – could result in positive test results, since they all would metabolize as ethyl glucuronide;

    c.    The cutoffs of 250ng/ml and 500ng/ml are arbitrary standards since incidental exposure to ethanol-containing products could show up at levels well above these levels;

    d.    The published state of scientific knowledge, going as far back as March 2004, included the information set forth in subparagraphs a-c above.

25.    This has not deterred the $4 billion-a-year industry, and the defendants, it is believed and therefore averred, solely due to a motive of profits,  (a) continue to

promote the EtG test as valid, (b) have not established a non arbitrary cutoff; and/or, (c) have not repudiated the test to the licensing boards and agencies.

26.     On August 12, 2006, The Wall Street Journal published a front-page article, titled "A Test for Alcohol – And Its Flaws."

27.     Quoting Dr. Skipper, among others, the article includes:

"Little advertised, though, is that EtG can detect alcohol even in people who didn't drink. Any trace of alcohol may register, even that ingested or inhaled through food, medicine, personal-care products or hand sanitizer."

"The test 'can't distinguish between beer and Purell' hand sanitizer, says H. Westley Clark, director of the Federal Substance Abuse and Mental Health Services Administration. . . 'When you're looking at loss of job, loss of child, loss of privileges, you want to make sure the test is right", he says…"

"Use of this screen has gotten ahead of the science,' says Gregory Skipper…"

28.     In a February 2007 article in the magazine "New Scientist," Dr. Skipper is quoted that:

"…there is not yet an agreed threshold concentration that can be used to separate people who have been drinking from those exposed to alcohol from other sources. Below 1000 nanograms of EtG per millilitre of urine is probably 'innocent', and above 5000 booze is almost certainly to blame. In between there is a "question zone…"

29.     Upon information and belief, representatives of Compass and NMS continue to deny and challenge these warnings, insisting that the tests are accurate and reliable measurements based on alleged scientific research.

30.     On September 28, 2006, SAMHSA, a federal agency that is part of the U.S. Department of Health and Human Resources, issued an Advisory, which on the first page contained a "grey box" warning, as follows:

"Currently, the use of an EtG test in determining abstinence lacks sufficient proven specificity for use as primary or sole evidence that an individual prohibited from drinking, in a criminal justice or a regulatory compliance context, has truly been drinking. Legal or disciplinary action based solely on a positive

EtG, or other test discussed in this *Advisory* is inappropriate and scientifically unsupportable at this time. These tests should currently be considered as potential valuable clinical tools, but their use in forensic settings is premature."

31.    Defendants have refused to follow the SAMHSA Advisory and continue to utilize an arbitrary cutoff, and support their "positive" findings to the Board (and other licensing and law enforcement agencies) in the face of disciplinary action against the tested individuals.

32.    Defendants, by promoting, advertising, marketing, selling, and/or contracting with the licensing board, and/or designing, implementing, and managing the drug and alcohol testing program, and/or collecting the urine samples and/or utilizing, reporting and interpreting the EtG test to allegedly establish that the plaintiffs consumed an alcoholic beverage, had a duty to use a reasonable degree of care to avoid erroneous test results.

33.    Plaintiffs, as nurses and pharmacists, were intended test subjects and defendants knew that their licenses, occupations and reputations would be in jeopardy if they tested positive.

34.    Plaintiffs by entering into voluntary screening programs, both for rehabilitative and occupational reasons, relied on the validity of the tests to which they subjected themselves – with the goal that they could provide laboratory evidence of their abstinence.

35.    Because of the obvious, foreseeable, serious and devastating consequences (including, but not limited to damage to plaintiff's reputation, credibility and emotional well being) of reporting that the results were positive (within cutoffs established by the defendants), defendants had to use a reasonable degree of care to avoid erroneous test results to the foreseeable test subjects, including the plaintiffs.

36.    Instead, upon information and belief, defendants acted negligently and/or recklessly by:

a.    Marketing their tests without conducting adequate scientific or medical studies;

b.    Establishing cutoffs over which test results would be reported as "positive" that were arbitrary and scientifically unreliable and invalid;

c.    Promoting the EtG test with unsupported and false statements that a positive EtG test would unequivocally establish that the subject individual had consumed alcoholic beverages;

d.    Publishing warnings that the failure to conduct such a test would be negligence on the part of an employer or licensing board;

e.    Falsely asserting that the EtG test was the "gold standard" in ferreting out former alcoholics or drug users who were resuming or beginning to engage in prohibited alcoholic consumption in occupations requiring a "zero tolerance";

f.    Falsely asserting that EtG is not detectable in the urine unless an alcoholic beverage has been consumed, thereby concealing that incidental or involuntary exposure or consumption of products containing alcohol could result in positive findings;

g.    Failing and refusing to re-evaluate and re-set cutoff limits at levels that were scientifically sound and reliable markers for detecting the prohibited activity of alcoholic beverage consumption, and excluding other causes for their results;

h.       Failing to heed the warnings or cautionary advisories issued by Dr. Skipper, SAMHSA and others – that the cutoff levels were unreliable and arbitrary, and that incidental use could trigger positive results at levels at or above the cutoffs – and, instead, denying publicly and maintaining the warnings were insufficient to discredit the EtG test and its cutoff limits;

i.       Failing to protect the plaintiffs from foreseeable substantial harm in the form of disciplinary and punitive measures, when their EtG test systems were employed and relied upon for their accuracy and reliability;

j.       Utilizing, reporting and interpreting the EtG results of plaintiffs to assert that plaintiffs were violating their recovery by intentionally drinking alcoholic beverages.

37.      It was foreseeable to the defendants that false positive EtG results would severely damage the reputation and credibility of nurses and pharmacists who were maintaining their recovery from addiction, and that the apprehension of further false positives and the damage to their reputation would cause severe anxiety and emotional distress to such professionals, who had spent years in education to gain the right to practice their chosen profession, and who had in actuality maintained their recovery by overcoming addictions in order to reestablish their reputations as competent professionals.

**COUNT I**
**JOANNE ELIZABETH CLEVELAND V COMPASS VISION & NMS**

38.      Plaintiff Joanne Elizabeth Cleveland incorporates by reference paragraphs 1-37 as if set forth fully hereunder.

39.    In or about  March 2004, after admitting to pain medication dependency, Joanne Elizabeth Cleveland signed a Recovery Contract with the California State Board of Nursing submitting herself to a recovery program including, inter alia, future random urine testing.

40.    At all relevant times to this action, including the time in which she participated in the program, while working as a registered nurse, Ms. Cleveland maintained her recovery and sobriety, denied intentionally drinking any alcoholic beverages, denied any relapse and did not drink any alcoholic beverage.

41.    At all relevant times after March 2004, Ms. Cleveland completely complied with all of the aspects of her program, including attending meetings, and did her job soberly and competently.

42.    After nearly two years of working hard to maintain her recovery and regain her professional reputation, within a few months of the end of her program, on or about December 29, 2005, Ms. Cleveland submitted to a random urine analysis collected by Compass and performed by NMS.

43.    In January 2006 Ms. Cleveland received notice of a "positive" result of 600 ng/ml on the EtG test as reported and interpreted by defendants Compass Vision and NMS, despite the fact that she had not drank an alcoholic beverage, and suffered injury when she was placed in violation of her agreement.

44.    Ms. Cleveland has had a total of four "positive" EtG tests on urine samples collected by Compass, performed by NMS and reported and interpreted by both defendants, with the last "positive" EtG test of 900 ng/ml on or about July 27, 2006.

45.    Ms. Cleveland continued to declare and maintain that she had not drank alcoholic beverages in violation of her agreement, but she was labeled a liar, and not believed, due to the actions of both defendants, including Compass Vision through its MRO, in maintaining that these EtG tests were proof that she had drank alcoholic beverages.

46.    After the first false positive, Ms. Cleveland continued to submit to testing and has suffered severe apprehension and anxiety from the fear of again having a false positive EtG test and from the possibility of suffering a permanent stain on her license should she not be allowed to finish her program.

47.    The so called "positive" EtG testing of Ms. Cleveland and the injuries she suffered are as a direct result of the negligence and/or recklessness of the defendants in promoting, advertising, marketing, selling, and/or contracting with the licensing board, and/or designing, implementing, and managing the EtG alcohol testing program, and/or collecting the urine samples and/or performing and/or interpreting the EtG testing and/or utilizing the EtG test to allegedly establish that the plaintiff consumed an alcoholic beverage, when it lacked sufficient proven specificity for use as primary or sole evidence that an individual prohibited from drinking, in a regulatory compliance context, had truly been drinking.

48.    As a result of these "positive" EtG tests, Ms. Cleveland was not allowed to work as a nurse for approximately four weeks and had her program extended. She also has been required to have additional testing, treatment and program attendance. Moreover, she suffered damage to her reputation with consequent anxiety, stress and humiliation.

49.    As a further result of these "positive" EtG tests, Ms Cleveland was forced to leave the diversion program when she was unable to afford unneeded mandatory in-patient treatment, which the Board required as a result of her "positive" EtG tests.

50.    As a further result of these "positive" EtG tests, Ms Cleveland now faces at least three years of probation, with attendant costs, and the future loss of her license to practice nursing.

51.    As a further result of these "positive" EtG tests, Ms Cleveland suffered damage to her reputation and credibility in her chosen profession.

52.    As a further result of these "positive" EtG tests, Ms Cleveland has a permanent stain on her license, which would have been avoided had she successfully completed her program.

53.    The stain on Ms Cleveland's license, her damaged reputation and credibility, the apprehension that she would again have a false positive testing, and the probable future revocation of her nursing license after years of education and commitment to her profession, have caused plaintiff to suffer severe emotional distress, despite her knowing that she did not drink alcoholic beverages and that these tests must have been false positives.

54.    As a direct and proximate result of the defendants' negligence, plaintiff has suffered and/or may suffer great, permanent and irreparable harm. These injuries may include, but are not limited to: the active suspension of her license, probation, risk of the loss of her license, loss of earnings and earning capacity, additional expenses associated with random EtG tests and other evaluations and programs, lawyers fees, other pecuniary losses flowing directly and consequentially from the EtG testing, damage to reputation,

humiliation, insomnia, depression, anxiety and severe emotional and psychological distress, all or some of which are continuing in nature.

55.    As a direct and proximate result of the defendants' negligence, plaintiff suffered damages as a result of lost earnings and consequent costs for medical evaluations, treatment, program attendance and drug screenings. Her monetary losses to date total approximately $17,000 dollars.

56.    The aforesaid negligence and recklessness on the part of the defendants was wanton and outrageous in nature.

WHEREFORE, Plaintiff demands judgment against the Defendants for compensatory damages in an amount exceeding the jurisdictional limits for diversity, and punitive damages, plus interest and costs.

## COUNT II
## CYNTHIA DANIELS V COMPASS VISION & NMS

57.    Plaintiff Cynthia Daniels incorporates by reference paragraphs 1-37 as if set forth fully hereunder.

58.    In or about July 2004, after admitting to pain medication dependency, Cynthia Daniels, Pharm. D., signed a Recovery Contract with the California State Board of Pharmacy submitting herself to a recovery program including, inter alia, future random urine testing.

59.    At all relevant times to this action, including the time in which she participated in the program, while working as a pharmacist, Dr. Daniels maintained her recovery and sobriety, denied intentionally drinking any alcoholic beverages, denied any relapse and did not drink any alcoholic beverage.

60.     At all relevant times after July 2004, Dr. Daniels completely complied with all of the aspects of her program, including attending meetings, and did her job soberly and competently.

61.     After nearly two years of working hard to maintain her recovery and regain her professional reputation, and within weeks of being eligible for transition out of the program, on or about June 30, 2006, Dr. Daniels submitted to a random urine analysis collected by Compass and performed by NMS.

62.      In July Dr. Daniels received notice of a "positive" result of 510 ng/ml on the EtG test, as reported and interpreted by defendants Compass Vision and NMS, despite the fact that she had not drank an alcoholic beverage, and suffered injury when she was placed in violation of her agreement.

63.     Dr. Daniels has had a total of four "positive" EtG tests on urine samples collected by Compass, performed by NMS and reported and interpreted by both defendants, with the last "positive" EtG test in or about August, 2007.

64.     Dr. Daniels continued to declare and maintain that she had not drank alcoholic beverages in violation of her agreement, but she was labeled a liar, and not believed, due to the actions of both defendants, including Compass Vision through its MRO, in maintaining that these EtG tests were proof that she had drank alcoholic beverages.

65.     After the first false positive, Dr. Daniels continued to submit to testing and has suffered severe apprehension and anxiety from the fear of again having false positive EtG testing and from the possibility of suffering a permanent stain on her license should she not be allowed to finish her program.

.

66.    The so called "positive" EtG testing of Dr. Daniels and the injuries she suffered are as a direct result of the negligence and/or recklessness of the defendants in promoting, advertising, marketing, selling, and/or contracting with the licensing board, and/or designing, implementing, and managing the EtG alcohol testing program, and/or collecting the urine samples and/or performing and/or interpreting the EtG testing and/or utilizing the EtG test to allegedly establish that the plaintiff consumed an alcoholic beverage, when it lacked sufficient proven specificity for use as primary or sole evidence that an individual prohibited from drinking, in a regulatory compliance context, had truly been drinking.

67.    As a result of these "positive" EtG tests, Dr. Daniels was suspended for over six months and not allowed to work as a pharmacist, had difficulty finding employment after the suspension, was required to stay longer in the program and was required to have additional testing.. She also suffered damage to her reputation with consequent anxiety, stress and humiliation.

68.    As a further result of these "positive" EtG tests, Dr. Daniels suffered damage to her reputation and credibility in her chosen profession.

69.    The threat of a permanent stain on Dr. Daniels' license, her damaged reputation and credibility, the apprehension that she would again have a false positive testing, and the possible future revocation of her pharmacy license after years of education and commitment to her profession, have caused plaintiff to suffer severe emotional distress, despite her knowing that she did not drink alcoholic beverages and that these tests must have been false positives.

70.    As a direct and proximate result of the defendants' negligence, plaintiff has suffered and/or may suffer great, permanent and irreparable harm. These injuries may

include, but are not limited to: the active suspension of her license, probation, risk of the loss of her license, loss of earnings and earning capacity, additional expenses associated with random EtG tests and other evaluations and programs, lawyers fees, other pecuniary losses flowing directly and consequentially from the EtG testing, damage to reputation, humiliation, insomnia, depression, anxiety and severe emotional and psychological distress, all or some of which are continuing in nature.

71.    As a direct and proximate result of the defendants' negligence, plaintiff suffered damages as a result of lost earnings, penalty and loss of interest from retirement fund, and consequent costs for additional medical evaluations, treatment, program attendance and drug screenings. Her monetary losses to date total approximately $120,000 dollars.

72.    The aforesaid negligence and recklessness on the part of the defendants was wanton and outrageous in nature.

WHEREFORE, Plaintiff demands judgment against the Defendants for compensatory damages in an amount exceeding the jurisdictional limits for diversity, and punitive damages, plus interest and costs.

## COUNT III
## LAURA FUJISAWA V COMPASS VISION & NMS

73.    Plaintiff Laura Fujisawa incorporates by reference paragraphs 1-37 as if set forth fully hereunder.

74.    In or about January 2005, after admitting to pain medication dependency, Laura Fujisawa, Pharm.D., signed a Recovery Contract with the California State Board of Pharmacy submitting herself to a recovery program including, inter alia, future random urine testing.

75.    At all relevant times to this action, including the time in which she participated in the program, Dr. Fujisawa maintained her recovery and sobriety, denied intentionally drinking any alcoholic beverages, denied any relapse and did not drink any alcoholic beverage.

76.    At all relevant times after January 2005, Dr. Fujisawa completely complied with all of the aspects of her program, including attending meetings, and did her job soberly and competently.

77.    After almost two years of working hard to maintain her recovery and regain her professional reputation, on or about September 26, 2006, Dr. Fujisawa submitted to a random urine analysis collected by Compass and performed by NMS.

78.    In October, 2006 Dr. Fujisawa received notice of a "positive" result of 1800 ng/ml on the EtG test as reported and interpreted by defendants Compass Vision and NMS, despite the fact that she had not drank an alcoholic beverage, and suffered injury when she was placed in violation of her agreement.

79.    Dr. Fujisawa has had a total of six "positive" EtG tests on urine samples collected by Compass, performed by NMS and reported and interpreted by both defendants, with the last "positive" EtG test of 570 ng/ml in or about March 2007.

80.    Dr. Fujisawa continued to declare and maintain that she had not drank alcoholic beverages in violation of her agreement, but she was labeled a liar, and not believed, due to the actions of both defendants, including Compass Vision through its MRO, in maintaining that these EtG tests were proof that she had drank alcoholic beverages.

81.    After the first false positive, Dr. Fujisawa continued to submit to testing and has suffered severe apprehension and anxiety from the fear of again having false

positive EtG testing and from the possibility of suffering a permanent stain on her license should she not be allowed to finish her program.

82.     The so called "positive" EtG testing of Dr. Fujisawa and the injuries she suffered are as a direct result of the negligence and/or recklessness of the defendants in promoting, advertising, marketing, selling, and/or contracting with the licensing board, and/or designing, implementing, and managing the EtG alcohol testing program, and/or collecting the urine samples and/or performing and/or interpreting the EtG testing and/or utilizing the EtG test to allegedly establish that the plaintiff consumed an alcoholic beverage, when it lacked sufficient proven specificity for use as primary or sole evidence that an individual prohibited from drinking, in a regulatory compliance context, had truly been drinking.

83.     As a result of these "positive" EtG tests, Dr. Fujisawa has been prevented from working as a pharmacist for over one year and was required to have additional testing and treatment. She also suffered damage to her reputation with consequent anxiety, stress and humiliation.

84.     As a further result of these "positive" EtG tests, Dr. Fujisawa was terminated from the program as of about March 2007**,** and faces revocation proceedings, for which she has had to hire an attorney.

85.     As a further result of these "positive" EtG tests, Dr. Fujisawa now faces either years of probation, with attendant costs, and/or the future loss of her license to practice as a pharmacist.

86.     As a further result of these "positive" EtG tests, Dr. Fujisawa suffered damage to her reputation and credibility in her chosen profession.

87.     As a further result of the "positive" EtG test, Dr. Fujisawa has a permanent stain on her license, which would have been avoided had she successfully completed her program.

88.     The stain on Dr. Fujisawa's license, her damaged reputation and credibility, the apprehension that she would again have a false positive test, and the probable future revocation of her pharmacy license after years of education and commitment to her profession, have caused plaintiff to suffer severe emotional distress, despite her knowing that she did not drink alcoholic beverages and that this test must have been false positives.

89.     As a direct and proximate result of the defendants' negligence, plaintiff has suffered and/or may suffer great, permanent and irreparable harm. These injuries may include, but are not limited to: the active suspension of her license, probation, risk of the loss of her license, loss of earnings and earning capacity, additional expenses associated with random EtG tests and other evaluations and programs, lawyers fees, other pecuniary losses flowing directly and consequentially from the EtG testing, damage to reputation, humiliation, insomnia, depression, anxiety and severe emotional and psychological distress, all or some of which are continuing in nature.

90.     As a direct and proximate result of the defendants' negligence, plaintiff suffered damages as a result of lost earnings, legal fees, and consequent costs for medical evaluations, treatment, program attendance and drug screenings. Her monetary losses to date total more than $105,000 dollars.

91.     The aforesaid negligence and recklessness on the part of the defendants was wanton and outrageous in nature.

WHEREFORE, Plaintiff demands judgment against the Defendants for compensatory damages in an amount exceeding the jurisdictional limits for diversity, and punitive damages, plus interest and costs.

**COUNT IV**
**CAROLINE HOWE V COMPASS VISION & NMS**

92.    Plaintiff Caroline Howe incorporates by reference paragraphs 1-37 as if set forth fully hereunder.

93.    In or about March 2005, after admitting to prescription pain medication dependency, Caroline Howe signed a Recovery Contract with the California State Board of Nursing submitting herself to a recovery program including, inter alia, future random urine testing.

94.    At all relevant times to this action, including the time in which she participated in the program while working as a registered nurse, Ms. Howe maintained her recovery and sobriety, denied intentionally drinking any alcoholic beverages, denied any relapse and did not drink any alcoholic beverage.

95.    At all relevant times after March 2005, Ms. Howe completely complied with all of the aspects of her program, including attending meetings, and did her job soberly and competently.

96.    After over a year of working hard to maintain her recovery and regain her professional reputation, in or about July, 2006, Ms. Howe submitted to a random urine analysis collected by Compass and performed by NMS.

97.    Later that month she received notice of two low level "positive" results on EtG tests as reported and interpreted by defendants Compass Vision and NMS, despite

the fact that she had not drank an alcoholic beverage, and suffered injury when she was placed in violation of her agreement. She was not told the actual levels.

98.    Plaintiff has had a total of seven "positive" EtG tests on urine samples collected by Compass, performed by NMS and reported and interpreted by both defendants, with the last "positive" EtG test in or about September 21, 2007.

99.    Ms. Howe continued to declare and maintain that she had not drank alcoholic beverages in violation of her agreement, but she was labeled a liar, and not believed, due to the actions of both defendants, including Compass Vision through its MRO, in maintaining that these EtG tests were proof that she had drank alcoholic beverages.

100.    After the first false positive, Ms. Howe continued to submit to testing and has suffered severe apprehension and anxiety from the fear of again having false positive EtG testing and from the possibility of suffering a permanent stain on her license should she not be allowed to finish her program.

101.    The so called "positive" EtG testing of Ms. Howe and the injuries she suffered are as a direct result of the negligence and/or recklessness of the defendants in promoting, advertising, marketing, selling, and/or contracting with the licensing board, and/or designing, implementing, and managing the EtG alcohol testing program, and/or collecting the urine samples and/or performing and/or interpreting the EtG testing and/or utilizing the EtG test to allegedly establish that the plaintiff consumed an alcoholic beverage, when it lacked sufficient proven specificity for use as primary or sole evidence that an individual prohibited from drinking, in a regulatory compliance context, had truly been drinking.

102.    As a result of these "positive" EtG tests, Ms. Howe has had her program extended; she was not allowed to work as a nurse for approximately 10 weeks; in January 2007 she was prohibited from taking a nursing position that paid substantially more than what she was then making; as of August 30, 2007 she had to leave her job with the Red Cross. She also has been required to have additional testing, treatment and program attendance. Moreover she has suffered damage to her reputation with consequent anxiety, stress and humiliation.

103.    As a further result of these "positive" EtG tests, Ms. Howe suffered damage to her reputation and credibility in her chosen profession.

104.    The threat of a permanent stain on Ms. Howe's license, her damaged reputation and credibility, the apprehension that she would again have a false positive test, and the possible future revocation of her nursing license after years of education and commitment to her profession, have caused plaintiff to suffer severe emotional distress, despite her knowing that she did not drink alcoholic beverages and that these tests must have been false positives.

105.    As a direct and proximate result of the defendants' negligence, plaintiff has suffered and/or may suffer great, permanent and irreparable harm. These injuries may include, but are not limited to: the active suspension of her license, probation, risk of the loss of her license, loss of earnings and earning capacity, additional expenses associated with random EtG tests and other evaluations and programs, lawyers fees, other pecuniary losses flowing directly and consequentially from the EtG testing, damage to reputation, humiliation, insomnia, depression, anxiety and severe emotional and psychological distress, all or some of which are continuing in nature.

106.    As a direct and proximate result of the defendants' negligence, plaintiff suffered damages as a result of lost earnings and consequent costs for medical evaluations, treatment, program attendance and drug screenings. Her monetary losses to date total approximately $45,000 dollars.

107.    The aforesaid negligence and recklessness on the part of the defendants was wanton and outrageous in nature.

WHEREFORE, Plaintiff demands judgment against the Defendants for compensatory damages in an amount exceeding the jurisdictional limits for diversity, and punitive damages, plus interest and costs.

### COUNT VI
### TRACEY MOORE V COMPASS VISION & NMS

108.    Plaintiff Tracey Moore incorporates by reference paragraphs 1-37 as if set forth fully hereunder.

109.    In or about November 2006, after 10 years of continuous recovery, in order to complete probationary terms from a ten year prior pain medication dependency, Tracey Moore, Pharm.D., signed a Recovery Contract with the California State Board of Pharmacy submitting herself to a recovery program including, inter alia, future random urine testing.

110.    At all relevant times to this action, including the time in which she participated in the program, while working as a pharmacist, Dr. Moore maintained her recovery and sobriety, denied intentionally drinking any alcoholic beverages, denied any relapse and did not drink any alcoholic beverage.

111.    Dr. Moore completely complied with all of the aspects of her program, including attending meetings, and was able to perform pharmacists' duties soberly and competently.

112.    After over ten years of working hard to maintain her recovery and regain her professional reputation, on or about March 10, 2007, Dr. Moore submitted to a random urine analysis collected by Compass, performed by NMS.

113.    Later that month Dr. Moore received notice of a "positive" result  of 315 ng/ml on the EtG test as reported and interpreted by defendants Compass Vision and NMS, despite the fact that she had not drank an alcoholic beverage, and suffered injury when she was placed in violation of her agreement.

114.    Dr. Moore continued to declare and maintain that she had not drank alcoholic beverages in violation of her agreement, but she was labeled a liar, and not believed, due to the actions of both defendants, including Compass Vision through its MRO, in maintaining that the EtG test was proof that she had drank alcoholic beverages.

115.    After the false positive, Dr. Moore continued to submit to testing and has suffered severe apprehension and anxiety from the fear of again having false positive EtG testing and from the possibility of suffering a permanent stain on her license should she not be allowed to finish her program.

116.    The so called "positive" EtG testing of Dr. Moore and the injuries she suffered are as a direct result of the negligence and/or recklessness of the defendants in promoting, advertising, marketing, selling, and/or contracting with the licensing board, and/or designing, implementing, and managing the EtG alcohol testing program, and/or collecting the urine samples and/or performing and/or interpreting the EtG testing and/or utilizing the EtG test to allegedly establish that the plaintiff consumed an alcoholic

beverage, when it lacked sufficient proven specificity for use as primary or sole evidence that an individual prohibited from drinking, in a regulatory compliance context, had truly been drinking.

117.    As a result of the "positive" EtG test, Dr. Moore was suspended for one week and not allowed to work as a pharmacist, was ordered to test more often, have additional counseling and suffered damage to her reputation with consequent anxiety, stress and humiliation.

118.    As a further result of these "positive" EtG tests, Dr. Moore suffered damage to her reputation and credibility in her chosen profession.

119.    The threat of a permanent stain on Dr. Moore's license, her damaged reputation and credibility, the apprehension that she would again have a false positive test, and the possible future revocation of her pharmacy license after years of education and commitment to her profession, have caused plaintiff to suffer severe emotional distress, despite her knowing that she did not drink alcoholic beverages and that these tests must have been false positives.

120.    As a direct and proximate result of the defendants' negligence, plaintiff has suffered and/or may suffer great, permanent and irreparable harm. These injuries may include, but are not limited to: the active suspension of her license, probation, risk of the loss of her license, loss of earnings and earning capacity, additional expenses associated with random EtG tests and other evaluations and programs, lawyers fees, other pecuniary losses flowing directly and consequentially from the EtG testing, damage to reputation, humiliation, insomnia, depression, anxiety and severe emotional and psychological distress, all or some of which are continuing in nature.

121.    As a direct and proximate result of the defendants' negligence, plaintiff suffered damages as a result of lost earnings and consequent costs for medical evaluations, program attendance and drug screenings. Her monetary losses to date total approximately $4,000.

122.    The aforesaid negligence and recklessness on the part of the defendants was wanton and outrageous in nature.

WHEREFORE, Plaintiff demands judgment against the Defendants for compensatory damages in an amount exceeding the jurisdictional limits for diversity, and punitive damages, plus interest and costs.


POMERANTZ PERLBERGER & LEWIS LLP


BY:    _____/s/_____
                Norman Perlberger, Esquire
                Attorney Pro Hac Vice for Plaintiff

Norman Perlberger, Esquire
Eliot H. Lewis, Esquire                    Attorneys Pro Hac Vice for Plaintiff
POMERANTZ PERLBERGER & LEWIS LLP
21 South 12th Street, 7th Floor
Philadelphia, PA 19107
(215) 569-8866
nperlberger@ppl-law.com
ehlewis@ppl-law.com

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| **JOANNE ELIZABETH CLEVELAND, CYNTHIA DANIELS, LAURA FUJISAWA, CAROLINE HOWE and TRACEY MOORE** **Plaintiffs** | : : : : : | **CIVIL ACTION NO. CV 07 5642 EDL** |
| **vs.** | : : | |
| **COMPASS VISION, INC. and NATIONAL MEDICAL SERVICES, INC. d/b/a NMS LABS** | : : : : | **JURY TRIAL DEMANDED** |

## <u>CERTIFICATION OF SERVICE</u>

NORMAN PERLBERGER, ESQUIRE, hereby certifies that service of Plaintiffs' Amended

Complaint was made this date by ecf-filing and first-class mail to the following:

Catherine A. Salah, Esquire              Christian Barrett Green, Esquire
Gordon & Rees, LLP                        Law Offices of Samuel G. Grader
275 Battery Street, Suite 2000            2180 Harvard Street, Suite 400
San Francisco, CA    94111                Sacramento, CA    95815


                    /s/
                    NORMAN PERLBERGER, ESQUIRE


DATED:      January 9, 2008