# Exhibit 2

Exhibit 2

## IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Luz M. Perez-Rocha, M.D.,  :
           Petitioner  :
             :
    v.  :
             :
Commonwealth of Pennsylvania, Bureau of :
Professional and Occupational Affairs,  :
State Board of Medicine,  : No. 2225 C.D. 2006
           Respondent  : Submitted: June 29, 2007

BEFORE:   HONORABLE JAMES GARDNER COLINS, Judge
                HONORABLE RENÉE COHN JUBELIRER, Judge
                HONORABLE JIM FLAHERTY, Senior Judge

**OPINION**
**BY JUDGE COLINS**                      **FILED: October 9, 2007**

      Presented to the Court is the issue of whether the State Board of Medicine (Board) erred in rendering its decision to vacate the stay of the suspension of the license to practice medicine of Luz Perez-Rocha, M.D. (Petitioner), terminating her probation, and actively suspending her license for no less than three years, retroactive to December 20, 2005. The case comes to this Court by way of Petitioner's petition for review from the order of the Board entered June 22, 2006. We affirm the Board.

      The charges against Petitioner arose from a Petition for Appropriate Relief (PAR) alleging that Petitioner violated her Disciplinary Monitoring Unit

Consent Agreement (DMU Agreement) adopted by the Board.[1] Under the terms of the DMU Agreement, Petitioner consented to the suspension of her license for no less than three (3) years, such suspension to be immediately stayed in favor of no less than three (3) years of probation. The DMU Agreement specifically states:

> (27) Notification of a violation of the terms or conditions of this Agreement shall result in **IMMEDIATE VACATING** of the stay order, **TERMINATION** of the period of probation, and **ACTIVATION** of the suspension, imposed in paragraph 4a above, of Respondent's license(s) to practice the profession in the Commonwealth of Pennsylvania as follows:...
>
> (h) If the Board or hearing examiner after the formal hearing makes a determination against Respondent, a final order will be issued sustaining the suspension of Respondent's license and imposing any additional disciplinary measures deemed appropriate.

(Consent Agreement and Order, pp. 4, 12, 15, emphasis and capitals in original.)

Random Observed Body Fluid Screenings (ROBS) submitted by Petitioner as a condition of the DMU Agreement on August 30, 2005, December

---

[1] The DMU Agreement states that Petitioner, a psychiatrist, came to the attention of the Board when she was reported by nursing service at Temple University Hospital system to have alcohol on her breath when she returned to work after lunch on July 3, 2003; in a prior incident in November, 2002, she had been drinking at a wedding party, left to go home about midnight and parked on the lot of the hospital where she was employed because she realized that she was not fit to drive. Petitioner was discovered sleeping in her car about 1:00 AM by a hospital employee, who had her taken to the Emergency Department where she was observed and later released. She was subsequently evaluated and treated at Marworth; her diagnosis was alcohol dependence. As a result of these activities, the Board found that Petitioner violated the Medical Practice Act, Act of December 20, 1985, P.L. 457, *as amended*, at 63 P.S. §422.41(5) in that she is unable to practice the profession with reasonable skill and safety to patients by reason of illness or addiction to drugs or alcohol. (Exhibit 1, Consent Agreement and Order, pp. 2-4.)

12, 2005, and December 16, 2005 were positive for ethyl glucuronide[2] (EtG), and positive for ethanol on the December 16 test. Petitioner filed a motion to exclude the results of the specimens tested by EtG, asserting that the EtG testing methodology has not gained general acceptance in the scientific community as evidence of alcohol consumption.

On the first of two days of administrative hearings held in April, 2006, hearing examiner John T. Henderson, Jr. (Hearing Examiner) focused on what is commonly referred to as a *Frye* motion.[3] The *Frye* test was first adopted by our Supreme Court in *Commonwealth v. Topa*, 471 Pa. 223, 369 A.2d 1277 (1977), and reaffirmed more recently in *Grady v. Frito-Lay*, 576 Pa. 546, 839 A.2d 1038 (2003). In *Groce v. Department of Environmental Protection*, 921 A.2d 567 (Pa. Cmwlth. 2007), this Court recently quoted our Superior Court's explanation of the *Frye* test in *Tucker v. Community Medical Center*, 833 A.2d 217, 223-24 (Pa. Super. 2003):

> ... [T]he *Frye* test sets forth an exclusionary rule of evidence that applies only when a party wishes to introduce ***novel scientific evidence obtained from the conclusions of an expert scientific witness.*** Under *Frye,* a party wishing to introduce such evidence must demonstrate to the trial court that the relevant scientific community has reached ***general acceptance*** of the

---

[2] Ethyl glucuronide (EtG) is a unique metabolite formed through metabolism of ethanol. EtG is screened and confirmed using high performance liquid chromatograph linked to a tandem mass spectrometer. To be confirmed positive, the metabolite concentration must be equal to or greater than the established confirmation cutoffs. The screening and confirmation cutoffs have been established at 250 ng/mL. (Affidavit of David J. Kuntz, Ph.D., Laboratory Director of Northwest Toxicology, Hearing Exhibit, Appendix A, pps. 4, 6.)

[3] *Frye v. United States,* 293 F. 1013 (D.C. Cir 1923).

3

> principles and methodology employed by the expert witness before the trial court will allow the expert witness to testify regarding his conclusions. However, the **_conclusions_** reached by the expert witness from generally accepted principles and methodologies need not also be generally accepted. Thus, a court's inquiry into whether a particular scientific process is "generally accepted" is an effort to ensure that the **_result_** of the scientific process, *i.e.*, the proffered evidence, stems from "scientific research which has been conducted in a fashion that is generally recognized as being sound, and is not the fanciful creations [sic] of a renegade researcher."

(Citations omitted; emphasis in original.)

The United States Supreme Court rejected *Frye* in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), where it determined that *Frye*'s general acceptance rule had been superseded by adoption of the Federal Rules of Evidence, and was no longer consistent with the federal law's liberal thrust. However, although a number of state courts have adopted the standard enunciated in *Daubert*, in the *Frito-Lay* case, our Supreme Court concluded that the *Frye* rule will continue to be applied in Pennsylvania. In *Frito-Lay*, our Supreme Court explained the difference between the two tests:

> Under *Daubert*, the trial judge evaluates whether the evidence will assist the trier of fact, and whether the evidence is reliable and scientifically valid. *Id.* at 592, 113 S.Ct. 2786. Moreover, *Frye*'s criteria of general acceptance is not required, but is only one factor, among several, that the court may assess in determining whether to admit the scientific testimony. *Id.* at 594, 113 S.Ct. 2786...In our view, *Frye*'s "general acceptance" test is a proven and workable rule, which when faithfully followed, fairly serves its purpose of assisting the courts

4

> in determining when scientific evidence is reliable and should be admitted.

*Id.* at 576 Pa. 546-7, 556, 839 A.2d 1038, 1044.

The Board affirmed the decision of the Hearing Examiner to admit the results of EtG testing, adopting the Hearing Examiner's findings of fact and conclusions of law. The Board stated:

> After a review of the evidentiary record, the Board concludes that the EtG testing which served as the basis for the charges set forth in the Amended Petition for Appropriate Relief (APAR) is generally accepted within the scientific community and meets the threshold requirements for admissibility under Pennsylvania law. In reviewing the evidence, it is clear that while EtG testing is relatively new and is subject to some controversy, especially when a low threshold is utilized, it has gained acceptance as a tool for monitoring the presence of alcohol in the system. *Frye v. United States,* 293 F. 1013 (D.C. Cir 1923); *Grady v. Frito-Lay,* 839 A.2d 1038 (Pa. 2003). EtG is a metabolite of alcohol, and is produced within the body only when alcohol is present. Many studies support EtG testing as an appropriate and reliable means for indicating the presence of alcohol in the subject's system. Further EtG testing measures outcomes in nanograms, a billionth of a gram, a measure of 10 to the 9 power. This precise level of measurement is an indication of reliability, reproducibility and accuracy.

(Board's Final Adjudication and Order, November 2, 2006, p. 4.)

The second day of the administrative hearing focused on the allegations set forth in the PAR. In a thorough and well-reasoned proposed Adjudication and Order, the Hearing Examiner concluded:

5

>There is no doubt from the record that the Respondent violated the terms of her DMU Agreement. Under the DMU Agreement, the Respondent was required to remain in an approved treatment and monitoring program and make satisfactory progress...and adhere to all conditions as set forth in the DMU Agreement...These conditions included abstaining from alcohol and, to ensure her abstinence, submitting to unannounced Random Observed Body Fluid Screenings (ROBS)...The evidence demonstrates that Respondent failed to abide by these terms.

(Hearing Examiner's Adjudication and Order, June 22, 2006, p. 14.)

The Board affirmed the proposed Adjudication and Order of the Hearing Examiner.

On appeal,[4] Petitioner argues first that the Board erred in concluding that EtG testing is generally accepted in the scientific community. Petitioner presented the testimony of Gary L. Lage, Ph.D., a toxicologist and pharmacist, who stated that only a small number of laboratories use the EtG test, and that this technology and methodology has only recently been used and is therefore unreliable, since experimental research on EtG testing is still being conducted and evaluated. Dr. Lage testified that although men and women metabolize ethanol differently, diverse studies have not been conducted regarding gender, ethnic

---

[4] This Court's standard of review of a decision of the State Board of Medicine is limited to determining whether necessary findings of fact are supported by substantial evidence in record and whether there was error of law or constitutional violation. *Marrero v. Commonwealth of Pennsylvania, Bureau of Professional and Occupational Affairs*, 892 A.2d 854 (Pa. Cmwlth. 2005), *petition for allowance of appeal denied*, 587 Pa. 717, 898 A.2d 1073 (2006). With regard to the standard of review that applies to the *Frye* issue, the admission of scientific expert testimony is an evidentiary matter for the trial court's discretion, and should not be disturbed on appeal unless the trial court abuses its discretion. *Frito-Lay*.

differences, or the effect of EtG and interactions with other drugs, food supplements, or antibiotics. Dr. Lage further testified as to Petitioner's personal health records, and indicated that the diabetes from which she suffers could increase the glucose levels in her urine, which, in turn, due to the presence of bacteria and yeast, could account for the ethanol found in her urine specimen from December 16, 2005. (Notes of Testimony, April 12, 2006, pp. 483-484.)

The Commonwealth presented the testimony of Anthony G. Costantino, Ph.D., the Vice President of Laboratory Operations at National Medical Services, Willow Grove, Pennsylvania (National), where Petitioner's specimens were retested. Dr. Costantino stated that EtG testing has been extensively peer reviewed, as evidenced by numerous scientific research articles published on EtG testing. Dr. Costantino testified that there will not be a positive, EtG result unless ethanol is ingested. (Notes of Testimony, April 11, 2006, pp. 31-119.) Dr. Costantino testified that the efficacy and reliability of the EtG test is not dependent upon the gender of the subject from whom the urine sample is obtained. (N.T., p.117.)

The Commonwealth presented studies and treatises dating back to 1996 concerning the reliability of EtG testing. David Kuntz, Ph.D., a witness who corroborated the testimony of Dr. Costantino, testified by telephone that he is the Laboratory Director for Northwest Toxicology of Salt Lake City, Utah, the laboratory where the initial testing of Petitioner's specimens was performed, and his laboratory completed approximately ten thousand EtG tests per month as of April, 2006, including testing for the National Transportation Safety Board and the Federal Aviation Administration. (N.T., April 11, 2006, pp. 251-317.) Dr. Costantino testified that National performed approximately 50,000 EtG tests in 2005, with samples submitted from thirty-five different states. (N.T., pp. 41-42.)

7

*Sub judice*, in his discussion, the Hearing Examiner stated that he was more impressed with the qualifications and testimony of the Commonwealth's experts, and therefore "placed more weight and credence on their testimony in support of EtG testing." (Hearing Examiner's Adjudication and Order, p. 13.) The Board adopted the discussion contained in the Hearing Examiner's adjudication, and concluded that EtG testing is generally accepted within the scientific community and meets the threshold requirements for admissibility under Pennsylvania law. We find no error in this conclusion.

We find no merit to petitioner's second argument, that the EtG and ethanol testing methods and results are incompetent and unreliable, and cannot support the conclusion that Petitioner violated the DMU Agreement. Petitioner avers that there were wide discrepancies in the reported numerical results, risk of taint during the collection process, failure to refrigerate the specimens and deficiencies in the certifying scientists' proficiencies. The Commonwealth presented testimony of Ms. Staci Hanna and Ms. Stacy Zeszut, two certified medical assistants at Crozer-Keystone Centers for Occupational Health, who were involved in the collection of urine specimens from Petitioner; each testified as to the step-by-step procedures employed during collection. Drs. Costantino and Kuntz testified at length as to the procedures employed at the laboratories where Petitioner's specimens were tested. Both the Hearing Examiner and the Board set forth the specific numerical results of the testing and retesting which occurred on each of the three dates in question. As stated by the Board:

> According to the test results from Northwest, one of the testing laboratories, the August 30, 2005 urine specimen tested positive for EtG at 3070 ng/ml, where the confirmation cut-off was 250 ng/ml….retest results from National, another testing laboratory, reconfirmed the EtG

8

>test results from Northwest on the August 30, 2005 urine specimen, with a reading of 3217 ng/ml. ...Respondent's December 12, 2005 urine specimen tested positive for EtG at 2930 and 3290 ng/ml, where the confirmation cut-off was 500 ng/ml...retest results from National reconfirmed the EtG test results from Northwest on the December 12 urine specimen, with a reading of 3800 ng/ml....Respondent's December 16, 2005 urine specimen tested positive for **ethanol at 39 mg/dl**, where the <u>confirmation cut-off was 20 mg/ml</u>. The Respondent requested that the specimens be retested. According to test results from Northwest in January 2006, the Respondent's December 16, 2005 urine specimen was retested and also tested positive for EtG at 59,400 ng/ml where the confirmation cut-off was 500 ng/ml. Further yeast and glucose level testing performed on this sample were found to be negative.

(Board's Final Adjudication and Order, p. 5, emphasis in original.)

Upon review, we find no evidence of incompetence or unreliability in either the methods employed or the reported results; the Board properly concluded that in light of the presence of both EtG and ethanol at such elevated levels, there *could be no doubt* that Petitioner ingested alcohol. (Board's Final Adjudication and Order, p. 6.) We emphasize that the Board is the agency charged with the responsibility and authority to oversee the medical profession and to determine the competency and fitness of its members to practice medicine within the Commonwealth. *Cassella v. State Board of Medicine*, 547 A.2d 506 (Pa. Cmwlth. 1988), *petition for allowance of appeal denied*, 522 Pa. 585, 559 A.2d 528 (1989). The Board is the ultimate fact finder and may accept or reject the testimony of any witness in whole or in part. *Barran v. State Board of Medicine*, 670 A.2d 765 (Pa. Cmwlth.), *petition for allowance of appeal denied*, 544 Pa. 685, 679 A.2d 230 (1996). The fact finder determines witness credibility, resolves conflicts in the

evidence, makes reasonable inferences from the evidence, and determines the weight to be assigned the evidence. *Id.*

Petitioner avers that the results of the December 16, 2005 specimen in particular are unreliable, and suggests that it was the Hearing Examiner's *implicit* determination that the explanations offered as to the presence of diabetes and yeast infections and their effect on the outcome of the ethanol testing were accepted. In fact, the Hearing Examiner concluded that despite Dr. Lage's testimony "the hearing examiner does not find that it serves as a valid basis for overturning the Respondent's EtG positive urine screens." (Hearing Examiner's Adjudication and Order, p. 20.) Given the presence of elevated levels of EtG in specimens taken from Petitioner on three different days, we see no need to speculate as to implicit determinations that the Hearing Examiner may have made with regard to Petitioner's ethanol test results.

Finally, Petitioner avers that her suspension of three years is far too severe; she argues that the record is barren of any indication that she ever put her patients in jeopardy, in anyway compromised patient safety, or engaged in any illegal activity. As a psychiatrist, her services are non-invasive, exposing patients to less risk than that of a physician who performs more invasive procedures. Indeed, the Hearing Examiner's Findings of Fact document the depth and breadth of Petitioner's recent work history, with sixty to seventy hour work weeks for three different entities, and support his conclusion that Petitioner has been professional and has not consumed alcohol in connection with her employment. However, in its adjudication, the Hearing Examiner emphasized the importance of compliance with the DMU Agreement, the terms of which ensure that Petitioner continues with her recovery and treatment, and noted that one of the most important terms of the DMU Agreement is its requirement for abstention. The Board found a lengthy

10

active suspension appropriate given the express terms of the DMU Agreement and Petitioner's failure to take responsibility for her actions. Accordingly, we will not reverse the decision of the Board.

The order of the Board is affirmed.

JAMES GARDNER COLINS, Judge

IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Luz M. Perez-Rocha, M.D.,
          Petitioner

v.

Commonwealth of Pennsylvania, Bureau of
Professional and Occupational Affairs,
State Board of Medicine,    : No. 2225 C.D. 2006
          Respondent

## ORDER

AND NOW, this 9th day of October 2007, the order of the State Board of Medicine entered in the above-captioned matter is affirmed.

JAMES GARDNER COLINS, Judge